**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-6842**

---

KEITH ALLEN WOOD,

Petitioner - Appellee,

v.

SHAWN STRAUGHN, Superintendent, Northern Regional Correctional Facility,

Respondent - Appellant.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  Gina M. Groh, District Judge.  (3:24-cv-00041-GMG)

---

Argued:  May 6, 2026                                Decided:  July 17, 2026

---

Before WYNN, Circuit Judge, FLOYD, Senior Circuit Judge, and Adam B. ABELSON, United States District Judge for the District of Maryland, sitting by designation.

---

Reversed and remanded with instructions by published opinion. Judge Wynn wrote the opinion, in which Senior Judge Floyd and Judge Abelson joined.

---

**ARGUED:**  Michael Ray Williams, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant.  Carl A. Frankovitch, FRANKOVITCH, ANETAKIS, SIMON, DECAPIO & PEARL, LLP, Weirton, West Virginia, for Appellee.  **ON BRIEF:**  John B. McCuskey, Attorney General, S. Hallie Hovey-Murray, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant.  M. Eric Frankovitch, FRANKOVITCH, ANETAKIS, SIMON, DECAPIO & PEARL, LLP, Weirton, West

Virginia, for Appellee.

_____

WYNN, Circuit Judge:

When a state prisoner seeks federal habeas relief, a federal court may disturb a state-court judgment only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or rested on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). And because Congress enacted those limits through AEDPA, federal review of state-court judgments is highly deferential.

Here, Keith Allen Wood argued that his retrial violated the Double Jeopardy Clause because the state trial court declared a mistrial without manifest necessity after defense counsel's opening statement. West Virginia's highest court rejected that argument on direct appeal. Yet the federal district court granted habeas relief after independently concluding that counsel's opening statement did not violate the trial court's pretrial orders and therefore could not justify a mistrial.

But the district court's analysis does not comport with AEDPA deference. Applying the correct standard, we reverse the district court's judgment and remand with instructions to deny the petition for habeas corpus.

I.

In 2018, a West Virginia grand jury indicted Wood on multiple counts of sexual offenses against a seven-year-old girl, A.R.R.[1] The indictment described the sexual conduct as occurring between May 1 and July 10, 2017.

---

[1] Because A.R.R. is a minor, we use only initials to identify her.

A.

Before trial, the parties discussed and litigated evidentiary issues. As relevant here, Wood successfully sought to exclude two categories of evidence.

The first was a video interview of A.R.R. taken in July 2017. A few days after A.R.R. told her mother that Wood had been violating her, law enforcement referred A.R.R. to Comfort House, a child advocacy center, where she was interviewed by "a nonmedical forensic interviewer" named Danielle Stroud. J.A. 230.[2] During their conversation, A.R.R. disclosed that Wood had facial hair that she could feel when he assaulted her. Stroud later testified that she found A.R.R.'s account credible because she described sexual content that a typical seven-year-old would not know.

In July 2018, the trial court entered an order noting that the parties had agreed that the video recording of Stroud's interview of A.R.R. "was done for investigative or forensic purposes and not for diagnosis and treatment purposes and [was] therefore inadmissible as evidence" under West Virginia law. *Id.* (citing *State v. Pettrey*, 549 S.E.2d 323, 326 (W. Va. 2001)). However, the State "intend[ed] to present the live testimony" of A.R.R. at trial, so while the parties stipulated that the video would "not be played to the jury during the presentation of the State's case . . . , the State [did] reserve the right to request" to use the video "if appropriate for rebuttal purposes." *Id.*

The second category of evidence that Wood sought to exclude was expert testimony from Sarah Aspenleiter, a social worker who began providing therapy to A.R.R. in July

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

2017. Aspenleiter diagnosed A.R.R. with post-traumatic stress disorder. During one session of play therapy, A.R.R. drew two figures in the sand and told Aspenleiter that one was "Keith," meaning Wood, and the other was "[her] brother Keith," possibly referring to an older stepbrother that A.R.R. had only met twice as an infant and toddler. J.A. 237.

In April 2020, on Wood's repeated motion, the trial court ruled that, because Aspenleiter was a clinical social worker and not a "licensed psychiatrist," she was "not qualified to opine as an expert regarding her diagnosis and/or treatment of" A.R.R. under West Virginia law. J.A. 233–34; *see id.* (citing W. Va. R. Evid. 702 and *State v. Edward Charles L.*, 398 S.E.2d 123, 126 (W. Va. 1990)). The court further concluded—also at Wood's urging—that "any statements made by [A.R.R.] and her mother during counseling sessions" were inadmissible hearsay. J.A. 234. But the court clarified that Aspenleiter could still "testify[] as a lay witness regarding any direct knowledge she may possess about the underlying allegations." *Id.*

Two weeks before trial, the court held a pretrial conference. Wood's counsel noted that the State had listed Stroud and Aspenleiter as witnesses and said that the State needed to "tread lightly there" because of the court's prior orders. J.A. 421–22. Defense counsel also said that the court had ruled that Aspenleiter's records would not come in and that testimony to the effect that "the child told me this, the mother told me that, dad told me this" would be "clearly not admissible." J.A. 422.

5

B.

The first trial began (and ended) on February 16, 2021. The court conducted voir dire, impaneled the jury, provided preliminary instructions, and told the parties to begin with opening statements.

In its opening statement, the State described the indictment and gave an overview of its case against Wood. The State did not mention Aspenleiter or any of A.R.R.'s statements during the Stroud interview at Comfort House, although it did state in passing that she had been interviewed there and that she had "described the events that occurred." J.A. 102.

Wood's counsel then gave his opening statement. Throughout the statement, he referred to specific statements that A.R.R. had made to Stroud and Aspenleiter. For example, he noted that during the Comfort House interview, A.R.R. had said that the person who assaulted her had a beard and that it first happened when she "was four or five or three." J.A. 104. He also noted that A.R.R. had told Aspenleiter that her assailant had a beard and described the play therapy session in which A.R.R. had drawn a figure that she described as her brother Keith. The thrust of the defense's opening statement was to suggest that someone else had assaulted A.R.R.—either her brother Keith or another man with facial hair—because evidence would show that Wood had always been beardless.

The State did not object during Wood's opening statement until counsel began discussing the anticipated testimony of character witnesses. The court held a sidebar on that issue, during which the State also asked for an in-chambers meeting at the end of

6

opening statements. Wood concluded his opening statement, and the court then held the requested in camera meeting.

During the meeting, the State argued that Wood's opening statement had violated the court's prior orders related to Stroud and Aspenleiter, and therefore the entirety of those records should be admitted. For example, the State argued that Wood's opening statement had referenced statements within the Aspenleiter records in which A.R.R. said that her assailant's name was Keith and that she could feel his facial hair when he assaulted her, and thus the State should be able to present her treatment statements "identif[ying] Keith Wood as her abuser dozens of times." J.A. 111.

Wood's counsel responded by arguing that the opening statement had not violated any pretrial orders. He argued that the order excluding A.R.R.'s statements to Stroud had only been directed at the State and that the order related to Aspenleiter still permitted him to ask her about information within her direct knowledge, which is what his opening statement had alluded to.

The trial court responded that it "couldn't disagree with [Wood's counsel] more." *Id.* The court stated that the records from Stroud and Aspenleiter had been excluded on Wood's motion, so Wood could not rely on them unless Stroud or Aspenleiter made an inconsistent statement—and even then, only for impeachment purposes. However, because the State had not objected during that portion of the opening statement, the court would not give a curative jury instruction, and so Wood was "simply going to have to live with that . . . if the jury finds themselves befuddled as to why they did not hear what [counsel] told them they were going to hear." J.A. 112.

7

Wood's counsel continued to argue that certain of A.R.R.'s statements should be admitted, such as that "she was three years old when this happened," because that statement was inconsistent with the facts in the indictment (which alleged that all of the abuse had occurred while she was seven). *Id.* When asked why, in that case, he had moved to exclude the Stroud interview, he responded that he had filed that motion "about three years [earlier], before [he] had gotten into this case as thoroughly as [he was] into it now." *Id.* The court said that the evidence could not come in during cross-examination of Stroud or Aspenleiter, but could come in under cross-examination of A.R.R.—but that if it did, "then everything is going to come in." *Id.* Wood agreed.

The State also agreed that "[t]hat is what we were asking for," but noted a general concern that it had prepared its witnesses on the assumption that "this was evidence that was unable to come into this trial," yet Wood had "addressed it as evidence that is absolutely coming into this trial." *Id.*

Additionally, though the parties initially agreed that "everything" should be admitted, further discussion revealed that they did not agree on what "everything" was, or how it would come in. They agreed that the entire Stroud interview could come in, including during the State's case-in-chief, if Wood had opened the door during cross-examination. But as to Aspenleiter's records, Wood argued that completeness only required admitting "the two pages or three pages that [he] brought up about the beard, the mustache, and the sand play therapy," but not the full records, which were "at least a half inch thick." J.A. 113. The court disagreed, saying that it was "simply all in or . . . all out," so Wood "need[ed] to decide if [he was] going to withdraw [his] objection to" Aspenleiter's

8

counseling records. J.A. 114. Wood declined to do so, so the court ruled that the records would be excluded—but that if A.R.R. made inconsistent statements and Wood wanted to use the Aspenleiter records to challenge that testimony, "then the entirety of the Aspenleiter records [would] come in." J.A. 115.

Upon further discussion of the procedures for admitting extrinsic evidence for impeachment, the State noted that it had "anticipated that this was going to become an issue, but there was no way for [it] to address it as an issue until it actually comes up." *Id.* At that point, the court asked if either of the parties wished to move for a mistrial. The State did so over Wood's objection.

The State argued that Wood's opening statement had "laid out this case" in a way that "makes it impossible to ignore this evidence," such that the State would be prejudiced. *Id.* If the evidence did not come in, the State would be prejudiced by Wood's unproven statements. If the evidence did come in, that would be contrary to the pretrial orders under which the State had prepared its case. Additionally, the State expressed a concern that bringing in inadmissible evidence could lead to reversal even if it did obtain a conviction.

Wood argued that there was no error but that if he had opened the door to that evidence, the court should let the evidence in.

The court granted the mistrial, stating as follows:

> As much as the Court has tried to draft solutions to this two-pronged problem that we have with regard to the . . . Comfort House, and the Aspenleiter records, I don't see that we could sufficiently salvage this with the evidentiary rulings and the give and take that has been conducted here in chambers this afternoon.

9

> Quite simply, . . . your opening statement ran grossly far afield into argument, and you, sir, interjected evidence that was excluded that could not have been placed before this jury but for responses that may or may not have been elicited in cross-examination.
>
> Therefore, I am going to declare a mistrial.

J.A. 116.

Wood responded that a mistrial was not necessary and that he would stipulate to bringing in the full Comfort House interview *and* full Aspenleiter records as part of the State's case-in-chief.

The court asked the State for a response, noting that Wood's proposal still put the State "at a strategic disadvantage trying a case that [it was] not prepared to try." J.A. 117. The State explained that it was also "at a disadvantage in terms of our opening statement where it seems like we just ignored all this" because it had been trying to comply with the court's pretrial orders. *Id.*

> The court then maintained its earlier ruling, stating as follows:
>
> The State did not disclose anything that was said in the [Comfort House] interview because they were in compliance with the Court during their opening statement. They did not reference anything in the Aspenleiter treatment [records] because they were in compliance with the Order of this Court.
>
> The defense ran grossly far afield and mentioned things that were excluded in the prior Court's rulings in both the Comfort House interview and within the Aspenleiter treatment notes.
>
> Then, out of fundamental fairness, I am forced, I have to declare a mistrial, which pains me because we are in a 2021 term of Court for a case that was indicted in 2018.

*Id.*

10

The court indicated that the parties would need to discuss, and possibly brief, how to handle the Stroud and Aspenleiter records at the retrial. At no point did the parties or the court explicitly discuss double-jeopardy concerns.

C.

The next month, March 2021, Wood moved to dismiss the indictment on the ground that it violated the Double Jeopardy Clause of the federal and West Virginia constitutions. In June, the trial court denied the motion, concluding that Wood's opening statement "ran so far afoul of previously entered evidentiary Court Orders that this Court had no choice but to grant the State's motion for a mistrial." J.A. 122. Thus, Wood "created a 'manifest necessity' to discharge the jury and re-try the case."[3] J.A. 123 (citing *United States v. Perez*, 22 U.S. 579, 580 (1824)).

Shortly thereafter, Wood filed a petition for a writ of prohibition with the Supreme Court of Appeals of West Virginia.[4] He argued that the trial court had granted a mistrial "without an adequate showing by the State of a manifest necessity." J.A. 128. He repeated his arguments that his opening statement did not violate the pretrial orders and argued that the State should have anticipated (and, in fact, did anticipate) issues related to the Stroud and Aspenleiter evidence. Wood also argued that the trial court did not sufficiently consider alternative measures: The court summarily rejected the suggestion that the evidence could be introduced as needed and Wood's subsequent offer to admit the evidence for all

---

[3] However, the court granted Wood's motion to dismiss the superseding indictment that the State filed after the mistrial, and Wood was retried based on the initial indictment.

[4] There was no intermediate state appellate court at the time; the Intermediate Court of Appeals of West Virginia began operating in 2022.

11

purposes, did not discuss any double-jeopardy implications, and did not instead give a limiting instruction to the jury.

In July 2021, the Supreme Court of Appeals of West Virginia rejected Wood's petition without providing substantive analysis.

Wood then turned to the federal district court, filing a habeas petition and stay motion in the Northern District of West Virginia. *Wood v. Olejasz*, No. 21-cv-103, 2021 WL 4450270 (N.D.W. Va. Aug. 10, 2021). On August 10, 2021—the date retrial was set to commence—the magistrate judge recommended rejecting the petition. *Id.* The district court accepted that recommendation the following month (after the retrial), dismissing the petition without prejudice. *Wood v. Olejasz*, No. 21-cv-103, 2021 WL 4448936 (N.D.W. Va. Sept. 28, 2021).

## D.

Wood was retried from August 10 to 13, 2021. The jury convicted him on all counts, after which Wood was sentenced to two terms of 25 to 100 years, plus two terms of 10 to 20 years, all to run consecutively.

Wood appealed to the Supreme Court of Appeals of West Virginia. He identified seven issues, including a double-jeopardy argument. In April 2023, the Supreme Court of Appeals affirmed. It concluded that Wood's "right against double jeopardy was not violated because, at his first trial, his counsel created a manifest necessity for the mistrial during his opening statement when he repeatedly referenced evidence that the trial court had clearly ruled inadmissible." *State v. Wood*, No. 21-0964, 2023 WL 2866229, at *5 (W. Va. Apr. 10, 2023) (per curiam).

12

E.

Wood timely filed the instant habeas proceedings in federal district court in April 2024, raising a double-jeopardy argument.[5]

A magistrate judge recommended that Wood's petition be denied and dismissed with prejudice. The recommendation relied primarily on the Supreme Court's decision in *Arizona v. Washington*, 434 U.S. 497 (1978), and concluded that Wood could not show that the state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established federal law." *Wood v. Straughn*, No. 3:24-cv-41, 2025 WL 2202991, at *9 (N.D.W. Va. May 30, 2025).

Wood objected to the report and recommendation, arguing that it failed to recognize differences between his case and *Washington* and that it overlooked "binding precedent that strictly limits when a mistrial may be declared over a defendant's objection." J.A. 568.

The district court agreed with Wood and granted his habeas petition. It reviewed the pretrial orders and concluded that "nothing in the rulings prohibited the comments [Wood's counsel] made in his opening statements." J.A. 589. That was because, the district court reasoned, the order excluding the Stroud interview "only restricted *the State* from producing certain evidence in *the State's case-in-chief*" and so "[n]othing in that Order prohibited defense counsel from doing anything." *Id.* Similarly, the court determined that the details that Wood's opening statement referenced from the Aspenleiter records "could

---

[5] This petition is not subject to the rules governing second-or-successive petitions because the first petition was dismissed without prejudice on procedural grounds. *E.g.*, *United States v. Said*, 26 F.4th 653, 658 n.7 (4th Cir. 2022).

be established on cross examination of the victim," and only if A.R.R. denied making those statements would the records themselves "become necessary." J.A. 590. Further, the court noted that "the State made no timely objection to any of the statements that supposedly violated the trial court's rulings." J.A. 589. Thus, relying on this Court's decision in *United States v. Sloan*, 36 F.3d 386 (4th Cir. 1994), the district court concluded that manifest necessity for a mistrial was lacking.

The State timely appealed.

## II.

We begin with a review of the substantive law underlying Wood's petition.

The Double Jeopardy Clause of the Fifth Amendment declares that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb."[6] U.S. Const. amend. V. "In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn." *Baum v. Rushton*, 572 F.3d 198, 206 (4th Cir. 2009). Thus, the double-jeopardy prohibition "embraces the defendant's valued right to have his trial completed by a particular tribunal." *Id.* (quoting *Washington*, 434 U.S. at 503). That prohibition does not apply if "a defendant seeks or consents to the grant of a mistrial." *Gilliam v. Foster*, 75 F.3d 881, 893 (4th Cir. 1996) (en banc) (citing *Oregon v. Kennedy*, 456 U.S. 667, 672–73 (1982)). But "when a defendant objects to a mistrial, he may be retried only if the mistrial was required by manifest necessity." *Seay v. Cannon*, 927 F.3d 776, 781 (4th Cir. 2019) (quotation omitted).

---

[6] The double-jeopardy prohibition applies "to the States through the Fourteenth Amendment." *Benton v. Maryland*, 395 U.S. 784, 794 (1969).

The phrase "manifest necessity" does not "describe a standard that can be applied mechanically" and "cannot be interpreted literally." *Washington*, 434 U.S. at 506. Yet there must be a "high degree" of necessity before a mistrial is appropriate. *Id.* The Supreme Court has, "for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." *United States v. Jorn*, 400 U.S. 470, 480 (1971) (plurality opinion). The Court has described a spectrum that contains "[a]t one extreme . . . cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence," and "[a]t the other extreme . . . [cases in which] the mistrial [is] premised upon the trial judge's belief that the jury is unable to reach a verdict." *Washington*, 434 U.S. at 507–09.

Generally, a reviewing court gives "great deference . . . to the decision of the trial judge to grant a mistrial." *Gilliam*, 75 F.3d at 894. For example, "we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected" by the circumstances giving rise to the mistrial. *Washington*, 434 U.S. at 511.

Even so, this deference "is not unlimited." *Gilliam*, 75 F.3d at 894. "[R]eviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial." *Id.* (quoting *Washington*, 434 U.S. at 514). A grant of a mistrial that "amounts to an irrational or irresponsible act" is an abuse of discretion. *Id.* (citing *Washington*, 434 U.S. at 514). The Supreme Court has not "explicitly articulated a test for a reviewing court to apply in analyzing whether the exercise of discretion by the trial judge in granting a mistrial was sound as opposed to irrational or irresponsible,"

15

though some factors may be gleaned from individual cases. *Id.*; *see id.* at 894–95 (collecting Supreme Court cases). This Court has held that those factors include "whether a trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity . . . on the peculiar facts presented"; "whether the trial judge acted precipitately"; and "whether the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Id.* at 894–95.

But here, we are not reviewing a federal district court's decision to grant a mistrial on direct appeal. Rather, we are evaluating a state-court decision on collateral review, applying the additional layer of deference that is required in habeas proceedings. Thus, we next place the double-jeopardy inquiry within the proper framework for this appeal.

### III.

We review de novo the district court's decision to grant habeas relief. *Kaur v. Warden, Md. Corr. Inst. for Women*, 151 F.4th 595, 607 (4th Cir. 2025). Within that review, however, "we are 'restricted by the statutory language of 28 U.S.C. § 2254, as amended by'" AEDPA. *Id.* (quoting *Bowman v. Stirling*, 45 F.4th 740, 752 (4th Cir. 2022)).

Under AEDPA, after a state court has adjudicated the merits of a petition for postconviction relief, the federal courts cannot grant relief unless the state-court proceedings "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination

16

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Wood argues that he is entitled to relief under both subsections. We disagree.

A.

We begin with Wood's disagreement with the state-court determination that his opening statement violated pretrial evidentiary rulings, which he frames as an unreasonable factual determination. But the interpretation of the pretrial order is a legal question, not a factual determination. *Cf. United States v. Parris*, 639 F. App'x 923, 927 (4th Cir. 2016) ("Our case law instructs that the interpretation of a prior order is ultimately a legal question[.]") (citing *Anderson v. Stephens*, 875 F.2d 76, 80 n. 8 (4th Cir. 1989)).

The Supreme Court of Appeals of West Virginia found that Wood's counsel had "repeatedly referenced evidence that the trial court had clearly ruled inadmissible." *Wood*, 2023 WL 2866229, at *5. But Wood does not challenge whether he, in fact, referenced the disputed evidence. Instead, he challenges the underlying legal interpretation, arguing that his preferred interpretation would have allowed him to make those references.

Because Wood only identifies legal questions, we proceed to our review under § 2254(d)(1), under which we evaluate whether the state-court decision was "contrary to" or "an unreasonable application of" U.S. Supreme Court precedent. Either inquiry first requires us to "identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Currica v. Miller*, 70 F.4th 718, 724 (4th Cir. 2023) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 61 (2013)).

17

Under this standard, "[w]e do not generally review state-court determinations of state-law questions, like the admissibility of evidence." *Richardson v. Kornegay*, 3 F.4th 687, 696 (4th Cir. 2021) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). That is because our jurisdiction over "federal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67 (quotation omitted). Thus, for us to review a state-law question, a petitioner "must establish either that the error was 'so extreme as to result in the denial of a constitutionally fair proceeding' or that it 'infring[ed] specific constitutional protections.'" *Richardson*, 3 F.4th at 696 (quoting *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008)).

Wood does not argue that the evidentiary ruling itself infringed on his constitutional rights. For example, he does not argue that excluding the evidence he referenced in his opening statement violated his constitutional right to present a complete defense, or otherwise that any particular interpretation of the pretrial order was constitutionally required.

But even assuming that Wood properly raised an argument that the state-court interpretation of the pretrial orders was erroneous in a way that infringed on his federal rights, we conclude that that argument fails.

We begin with the order excluding the Stroud video interview, which Wood argues did not apply to him at all. To be sure, the order was directed to the State, ordering that the video interview "will not be played to the jury during the presentation of the State's case" and that the State could request to use the video "if appropriate for rebuttal purposes." J.A. 230–31.

18

Yet the order also states that the parties had stipulated that the video "was done for investigative or forensic purposes and not for diagnosis and treatment purposes *and is therefore inadmissible as evidence*," J.A. 230 (emphasis added), under the Supreme Court of Appeals of West Virginia's decision in *State v. Pettrey*, 549 S.E.2d 323, 334 (W. Va. 2001), which held that a therapist's testimony is not admissible under an exception to the hearsay rule "if the evidence was gathered strictly for investigative or forensic purposes." West Virginia's general rule against the admissibility of hearsay evidence applies equally to defendants and the State. *E.g.*, *State v. Hundley*, 915 S.E.2d 845, 858 (W. Va. 2025).

Still, Wood argues that, even if the order excluded the video as substantive evidence for both parties, his opening statement did not violate the order because he could use the video for impeachment while cross-examining A.R.R. To what extent parties may preview anticipated impeachment evidence in opening statements is not immediately obvious under West Virginia law. *See State v. Robert Scott R., Jr.*, 754 S.E.2d 588, 596 (W. Va. 2014) (noting that the prosecution "should not have made comments about" the defendant's "anticipated evidence"); *see also id.* at 595 n.22 ("[A]s a practical matter, prosecutors should avoid commenting upon expected evidence by a defendant during their opening statements. . . . Such comments do nothing more than raise potential grounds for error."). And rulings on the propriety of opening statements are within the state trial court's discretion. *State v. Painter*, 63 S.E.2d 86, 91 (W. Va. 1950). Certainly, we can discern no *federal* right to preview otherwise-excluded evidence in opening statements.

Here, the state trial court found that Wood's opening statement went "far afield" by directly incorporating hearsay evidence "that could not have been placed before this jury

19

but for responses that may or may not have been elicited in cross-examination." J.A. 116. The Supreme Court of Appeals of West Virginia agreed. We see no basis upon which to review that question of state law.

Next, we consider the order excluding the Aspenleiter records. The order stated that "any statements made by [A.R.R.] and her mother during counseling sessions with Ms. Aspenleiter are inadmissible hearsay," but it also noted that "this ruling does not prevent Ms. Aspenleiter from testifying as a lay witness regarding any direct knowledge she may possess about the underlying allegations." J.A. 234.

During opening statements, Wood explicitly referred to A.R.R.'s statements to Aspenleiter during counseling sessions. And while, again, those statements could have been introduced for impeachment purposes if A.R.R. had testified inconsistently at trial, they were otherwise inadmissible. Here, too, we see no question of federal law for our review.

In sum, we have no occasion to review the Supreme Court of Appeals of West Virginia's conclusion that defense counsel's opening statement referenced evidence that had been excluded by pretrial evidentiary rulings. Wood is not entitled to habeas relief on the basis of those evidentiary rulings. And the fact that we may not review them, but instead must accept them as valid, lays crucial groundwork for our analysis of the heart of Wood's habeas claim.

## B.

We therefore turn to that central claim: that the Supreme Court of Appeals of West Virginia's decision rejecting Wood's double-jeopardy argument was "contrary to" or "an

unreasonable application of" the U.S. Supreme Court's manifest-necessity standard. *See* § 2254(d)(1). We conclude that it was not.

1.

First, we conclude that the Supreme Court of Appeals of West Virginia's decision was not "contrary to" Supreme Court precedent. "Under the 'contrary to' clause," federal courts may grant relief "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). This standard "refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020) (quoting *Williams*, 529 U.S. at 412) (cleaned up).

Wood points us to *Arizona v. Washington*, 434 U.S. 497 (1978), for both flavors of this argument.

In *Arizona v. Washington*, the Supreme Court considered, on pre-AEDPA habeas review, a mistrial that was prompted by defense counsel's improper opening statement. 434 U.S. at 498. After a conviction at the first trial, the trial court ordered a new trial "because the prosecutor had withheld exculpatory evidence," a decision that the Supreme Court of Arizona affirmed. *Id.* In his opening statement during the second trial, defense counsel told the jury, "You will hear that because of the misconduct of the County Attorney [in the first trial] and because he withheld evidence, that the Supreme Court of Arizona granted a new trial in this case." *Id.* at 499.

21

The State moved for a mistrial. *Id.* The trial court indicated that the evidence of misconduct—"and specifically the ruling of the Arizona Supreme Court"—was likely inadmissible, but defense counsel asked for (and was granted) time to provide authority to support its admissibility. *Id.* at 499–500. The next day, the State renewed the mistrial motion. *Id.* at 500. Defense counsel had found no authority to support the admissibility of the evidence. *Id.* Nevertheless, the parties engaged in an "extended argument" and discussed the double-jeopardy concerns associated with erroneously granting a mistrial. *Id.* at 501. Ultimately, the trial court granted a mistrial without expressly making a finding of "manifest necessity" or stating that the court had considered alternative solutions. *Id.*

Upon review, the U.S. Supreme Court concluded that "the difficulty which led to the mistrial in this case . . . falls in an area where the trial judge's determination is entitled to special respect" and that the trial judge had not erred in that case. *Id.* at 510. It explained that, assuming that the evidence was inadmissible, it would "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. That was true even though "[i]n a strict, literal sense, the mistrial was not 'necessary,'" and even though the trial judge had not made explicit findings of manifest necessity or that alternative solutions would be insufficient. *Id.*

Wood argues that the Supreme Court of Appeals of West Virginia acted contrary to *Arizona v. Washington* when it focused solely on which party was at fault. We disagree with both the premise and the conclusion.

22

The Supreme Court of Appeals held that Wood's counsel had created the manifest necessity that led to the mistrial "during his opening statement when he repeatedly referenced evidence that the trial court had clearly ruled inadmissible." *Wood*, 2023 WL 2866229, at *5. That is not a statement that solely identifies the party at fault. Rather, it referenced the pretrial evidentiary rulings as the core reason for the mistrial. And far from being contrary to *Washington*, that finding matches *Washington*'s approval of a mistrial granted "because the defendant's lawyer made improper and prejudicial remarks during his opening statement to the jury." *Washington*, 434 U.S. at 510.

And, of course, we cannot say that the state-court decision came out differently than a Supreme Court case with "materially indistinguishable facts," *Williams*, 529 U.S. at 413, at least when compared to *Washington*, because there, the Supreme Court concluded that the state trial court had properly granted a mistrial, *Washington*, 434 U.S. at 510. Thus, even assuming similarity, the state court here did not decide Wood's case differently than *Washington* when it also approved the grant of a mistrial.

2.

Second, we conclude that the state-court decision was not an "unreasonable application" of Supreme Court precedent.

Under this prong, we consider whether the state court's application is one that is "objectively unreasonable, not simply incorrect." *Owens*, 967 F.3d at 411 (quotation omitted). In other words, federal courts cannot grant relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

23

Moreover, we must consider a second layer of deference. Even on direct appeal, appellate courts give trial courts "broad deference" when considering whether the "manifest necessity" standard for granting a mistrial has been met. *Renico v. Lett*, 559 U.S. 766, 776 (2010). And manifest necessity is the type of "general standard" that creates a "greater . . . potential for reasoned disagreement among fair-minded judges," which means that state courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Id.* (quotation omitted).

Thus, we apply a "double-deference standard" to determine "whether there is any reasonable argument" that the state trial court acted within its discretion in granting a mistrial. *Owens*, 967 F.3d at 411 (quotation omitted) (discussing double deference in the context of an ineffective-assistance-of-counsel claim); *see Renico*, 559 U.S. at 773 ("The question under AEDPA is . . . whether the determination of the [state high court] that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law.'") (quoting 28 U.S.C. § 2254(d)(1)).

As we have discussed, to grant a mistrial over a defendant's objection, there must be "manifest necessity." *Washington*, 434 U.S. at 505. And when defense counsel's improper remarks during opening statement are what led to the mistrial, "we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511. But the trial judge must still have exercised "sound discretion," meaning that the judge cannot have acted "irrationally or irresponsibly." *Id.* at 514.

24

Wood argues that the Supreme Court of Appeals of West Virginia unreasonably applied *Arizona v. Washington* by failing to acknowledge or analyze a requirement to consider alternatives to granting a mistrial. We disagree.

As an initial matter, we "have no authority to impose mandatory opinion-writing standards on state courts." *Klein v. Martin*, 607 U.S. 213, 221 (2026) (per curiam) (cleaned up). The state court does not have to "discuss the evidence at all." *Id.* In other words, we do not sit in review of the way the Supreme Court of Appeals framed its inquiry into manifest necessity. Instead, the federal courts "carefully consider all the reasons and evidence supporting the state court's decision." *Id.* (quotation omitted). Here, a review of the record shows that the trial court explicitly considered and rejected at least some alternatives: After the back-and-forth on ways to admit the previously excluded evidence, the court determined that it did not "see that we could sufficiently salvage this with the evidentiary rulings." J.A. 116.

But even if the trial court did not consider alternatives, *Washington* does not impose that requirement.[7] *Renico*, 559 U.S. at 778–79. Indeed, in *Washington*, the state trial judge "had not canvassed on the record the possibility of alternatives to a mistrial," nor had the judge explicitly found manifest necessity. *Washington*, 434 U.S. at 501. The Court

---

[7] Wood also points to *United States v. Jorn*, 400 U.S. 470, 486 (1971), as imposing a requirement to consider alternatives. Even if we agreed that *Jorn* held as much, it is a non-binding plurality opinion. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81 (1987) ("[A] plurality opinion . . . did not represent the views of a majority of the Court, [and] we are not bound by its reasoning."). Thus, it cannot constitute "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

nonetheless held that "the record provides sufficient justification for the state-court ruling," such that "the failure to explain that ruling more completely does not render it constitutionally defective." *Id.* at 516–17.

Instead, Wood (and the district court) focus on this Court's opinion in *United States v. Sloan*. There, while considering a direct appeal, we reviewed several Supreme Court cases and identified three factors as relevant to whether "a judge had failed to exercise sound discretion": whether the judge "(1) acted precipitately or gave both defense counsel and the prosecutor full opportunity to explain their positions, (2) accorded careful consideration to the defendant's interest in having the trial concluded in a single proceeding, and (3) considered alternatives to declaring a mistrial." 36 F.3d at 394 (cleaned up). So, if Wood was a federal prisoner directly appealing his conviction after retrial in federal district court, this argument would carry some weight.

But that is not the standard under AEDPA. In conducting that review, the Supreme Court has explicitly held that we cannot rely on our own decisions that interpret *Washington* as setting forth "factors that determine whether a judge has exercised sound discretion in declaring a mistrial." *Renico*, 559 U.S. at 778 (considering a similar test articulated by the Sixth Circuit); *see id.* at 779 ("*Washington* nowhere established [the Sixth Circuit's] three factors as a constitutional test that determines whether a trial judge has exercised sound discretion in declaring a mistrial." (cleaned up)). That is because a federal Court of Appeals decision like *Sloan* does not "constitute 'clearly established Federal law, as determined by the Supreme Court,' § 2254(d)(1), so any failure to apply that decision cannot independently authorize habeas relief under AEDPA." *Id.* at 779.

26

Thus, under § 2254(d)(1), the Supreme Court of Appeals of West Virginia reasonably applied *Washington* to Wood's case.

*    *    *

In sum, this case reminds us that the deference we owe state courts under AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction." *Owens*, 967 F.3d at 411 (quoting *Harrington*, 562 U.S. at 102). "Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). However, "it does mean that we may not 'second-guess the reasonable decisions of state courts.'" *Owens*, 967 F.3d at 411 (quoting *Renico*, 559 U.S. at 779).

If we were reviewing Wood's argument in the context of a direct appeal, we might find it a closer question. But within the confines of AEDPA review, we cannot say that the state-court decision in this case was unreasonable.

IV.

For the foregoing reasons, we reverse the district court's judgment and remand with instructions to deny the petition for habeas corpus.

*REVERSED AND REMANDED WITH INSTRUCTIONS*